## BOWLES, Administrator, O.P.A., v. JAMES HENRY PACKING CO.
### No. 884.

District Court, W. D. Washington, N. D.

Dec. 12, 1944.

George H. Layman, District Enforcement Atty., and C. E. Hughes, Litigation Atty., O.P.A., both of Seattle, Wash., for plaintiff.

Almon Ray Smith and Henry Clay Agnew, both of Seattle, Wash., for defendant.

LEAVY, District Judge.

This matter is not an easy one of disposition. Like every lawsuit, there are substantial reasons that persuade both the litigant and counsel that they are on the right side.

I might state at the outset that I intend to make a disposition of this case now, though of course will make no formal findings and conclusions, and will permit counsel to submit them later, but will state generally what the facts are as I now find them, and the conclusions of law that we draw from them.

I think it is quite appropriate, because of the importance of this case to the defendant as well as to the government, to touch briefly upon what the objectives of this unusual, emergent and drastic legislation were and are. When it was enacted, it was sought to surround it with all sorts of safe-

guards, because it was such a departure from legislation, affecting as it does the most intimate private affairs of the American citizen, and it was expressly written into the act that it would automatically end at a given time, unless Congress saw fit to renew it. It is purely a legislative enactment that Congress in its wisdom thought was essential for the preservation of the nation in a period of crisis, and some of the cases that have arisen under the act and the regulations turned largely upon the issue as to whether the act was one to prevent inflation solely—and there is some language from the courts indicating such was the primary purpose, which is doubtless true in the particular cases being considered. The purposes of the act, however, are substantially broader than that of merely preventing inflation. The very first sentence of the act indicates that: "It is hereby declared to be in the interest of the national defense and security and necessary to the effective prosecution of the present war". Now, this is the broad purpose of the act, and then: "to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices". 50 U.S.C.A.Appendix § 901.

After this act had been in effect from the date of its enactment until the date of expiration, as fixed by its own terms, Congress saw fit to extend and to modify it, and to alter some of the drastic provisions, but still keep within its framework such parts as would make effective the major objectives, 50 U.S.C.A.Appendix § 901 et seq. Among other things, they wrote new language into the act, conferring somewhat greater discretionary powers upon the courts.

As I said at the outset, this is a most novel and unusual piece of legislation, and confers tremendous powers that ought only to be exercised by those who are given the responsibility of enforcing them with great circumspection and full knowledge of the effect that mistakes, if they make such, might have.

The courts have been and are even now denied the right to pass upon a regulation promulgated by an administrative official as to its constitutionality, or as to its effect, and likewise as to the act itself. In fact, some judicial construction has gone so far even in a criminal proceeding to hold that in defense of such criminal action, the accused could not interpose a constitutional question in the lower courts, and there has been set up by Congress in the enactment of this act a special court to pass upon such questions.

The enforcement of the act has resulted in a great amount of hardship, in some instances completely wiping out some people's businesses and their fortunes, while on the other hand it has made it possible for others to make fortunes. It has led to a new specie of crime and lawlessness known as "Black Market".

The act provides for both criminal and civil proceedings. In the instant case, the evidence indicates that the government sought first to proceed on the criminal side of the law and secured an indictment. That this indictment was later dismissed is not a matter of concern to this Court in making a disposition of the instant case, nor to pass upon what causes there were that motivated or brought about the dismissal of the indictment. It is enough to say that the evidence introduced in the case at bar would, in the judgment of the Court, not have sustained that degree of willful and unlawful violation of the act to support a criminal prosecution or conviction, but that is quite another matter from passing upon the question as to whether or not there was this civil violation.

If these two instruments that are called the "lease" and the "contract of employment" were effective instruments for what they purported to be, then I do not believe there was a violation. The terminology of the lease and of the contract of employment is not at fault. The draftsman of both is to be complimented upon his knowledge of the law involving contracts, both for the leasing of premises and the employment of persons, but we must go farther than a mere superficial examination of the documents themselves.

Here are the undisputed facts of the situation that confronted the defendant company, the James Henry Packing Company, when the law in question became effective, and the various regulations were put into operation, and particularly M.P.R. 169 was announced and made effective: The defendant, a meat packer which found the outlet of its product through some two or three hundred customers, who were retailers, and in addition to those two or three hundred customers, through one of their own stores that they owned exclusively—

found that by reason of the situation growing out of these regulations and maximum wholesale ceiling prices, and there being no ceiling price whatever upon livestock because livestock was considered an agricultural product—it could no longer process and sell certain grades of beef, except at a loss. This created a situation where the packers, and the smaller packers, particularly, could not supply the trade and sell their products within the limitations fixed by the regulations—that is, Regulation 169 and others that were pertinent, without suffering a loss, particularly as to certain types and grades of meat. If they could not slaughter and could not sell, then their customers would be lost, and their business and its future jeopardized.

This defendant, with advice of able counsel, gave thought and consideration to the regulation without an intent to violate it, but with a desire to comply with it and yet continue to remain in business and make a profit. The testimony of Mr. Joseph, its manager, was in substance, at least, that this gave rise to these leases and contracts of employment. Had it not been for the Emergency Price Control Act and the O.P.A. regulations, such an arrangement would never have been thought of, and immediately when they ceased, it is clear to the Court, the arrangement would have been cancelled.

Now let us see for a moment, from all of the facts and circumstances surrounding these transactions, if such leases and contracts were in fact steps such as would make the packing company the real party, not only in interest, but in control and possession, and having, in addition to the advantages of control and possession, all of the liabilities of operating the businesses.

I am constrained to find that situation is not supported by the facts here, and my reasons for so finding are that Mr. Joseph testified that out of his two or three hundred customers who were retailers, he selected twenty-five who were strategically located in the city so that they might maintain the business of the packing firm in supplying wholesale meat, and they might have at least that much of an advantage when the war is over and the restrictions were gone. The retailers selected were placed in a decidedly advantageous position over the other two hundred and fifty or two hundred and seventy-five that were not chosen.

While there is no direct evidence, it is only a logical and reasonable inference from the evidence that some representative of the defendant company stated to these retailers in substance that "Your business will be greatly increased, even enough that you can pay a percentage of your gross receipts from your meat market operations, and still be money ahead and still maintain your customers", therefore, this lease agreement. It is clear to this Court that the lease, insofar as actual possession, control, direction and operation, and the employment contract, insofar as directions and orders and management are concerned, were never contemplated as effective instrumentalities for taking over by the defendant company of the various meat markets. Not a thing was done during the whole four-month period to indicate such action. The same operator and owner at the time of the execution of the instruments has continued to be such throughout the whole period of time here involved.

The rentals that were fixed, the Court must find were arbitrarily fixed and were never fixed with any thought of actually being paid, because there is no basis at all to show why the minimum rental should be $25 as indicated by the stipulation in the evidence, and the maximum, $35, when some of the places did a volume of business that was three and four times what it was in others. I must hold that neither the lease nor the contract of employment created what they purported to create on their face, and they were merely the outgrowth of activities on the part of this defendant to meet a situation that confronted it by reason of an uncontrolled maximum price on livestock, and because selling its product as a processor under a controlled and maximum price made it difficult to continue processing meat at a profit. It is true the public was not compelled to pay any additional sum or any appreciable additional amount for the meats it bought, but the dealer was compelled to part with a margin of his gross profits ranging from 5% late in these transactions, to 10% at the beginning, and he parted with that by giving it to the defendant. The defendant took such percentage of profits openly and in good faith, not with an intent to commit an offense. When I use the words "good faith" I use them in counterdistinction to the words "willful" and "malicious" and "intentional". He took it to make up the losses that he

would sustain if he went out in the open market and bought livestock at the then going price. It thus becomes a method of indirection, in permitting the defendant to dispose of his processed beef products at a price in excess of the maximum, and therefore, it is a violation.

■ Under the law that existed prior to the time Congress amended it in July of 1944, this Court would have no discretion but to assess the damages and the penalties. With the amendments and with the provisions in the act as I understand it, even though all of the sales herein involved occurred prior to the date when the act was amended, they are still covered by it, and the issue of good faith, or as to whether or not the act was willful and the result of a failure to take practical precautions against the occurrence of the violation, becomes an issue here, and upon that issue turns the question as to what penalties, if any, should be assessed, and for what period of time.

I have already stated that I think the defendant initiated this novel and unusual procedure for the purpose of self-protection and self-preservation, and probably the suggestion came from others who were trying to do likewise, but that, of course, does not make it valid. In fact, it only goes to show to this Court how readily, if such undertakings were condoned and judicially approved, there would be a breakdown in the effective enforcement of this price control act.

The situation was, substantially different in October from what it was in July. It cannot only be argued with much force, but I do not hesitate to find as a fact, there was neither a willful violation nor was such violation the result of a failure to take practical precautions against the occurrence of a violation during the month of July.

■ The defendant through its president and manager, and through its counsel, sought to work out some plan whereby it would not violate the law, and yet be able to carry on its meat processing business to a degree sufficient to insure its survival, so I feel in making a disposition of this case that I should divide the whole period of time into lesser periods. The fact that the government has seen fit to aggregate four months and eight days into one action, I do not think, under the broad discretionary powers now given by the act, would prohibit me from making segregation of such periods, where the evidence discloses a different situation prevailed. I do this on the ground that on July 30th a letter went forward from O.P.A. officials, indicating clearly that the O.P.A. questioned this entire procedure, and at the very least, it should have been a warning. For that reason I think the overcharge made during the month of July should be measured by the amount thereof, which would be the damage without penalties. It is evident that upon the receipt of that letter there was some condition about Mr. Joseph's health, or something of that nature, that caused him to take no immediate action. That would be no excuse whatever in a matter of such importance as this is. However, the O.P.A. took no action, but by August 30th there was again a letter from them to the defendant, which again clearly indicates that the arrangement could not be approved, and that the conduct of the business under this arrangement would be looked upon and taken as an evasion and a violation. While there is some language by the writer of that letter that there might be further conferences, it is not sufficiently persuasive for me, in the exercise of discretion, to say that it meant the same practices should continue thereafter indefinitely, however, because of that letter and the negotiations which had taken place wherein the defendant was seeking to take reasonable precautions to avoid becoming subject to damages and penalties, hold that for the month of August, likewise, they should be liable only for the amount of the overcharges.

■ Now, as to September, October, and such days in November as are involved— from September 1st until the conclusion of these transactions, I find that violations were knowingly made, and were the result of a failure to take practical precautions. All precautions that could have been taken were not taken from September 1st and for that reason the judgment will be the amount of the overcharges plus 50% in addition, whatever that may be for such period.